Old Republic Insurance Company v. Stratford Insurance Company May it please the Court Dan Gerber for Old Republic Insurance Company The key issue really facing the Court today is one of public policy concern as well, and it includes whether this Court will endorse post-loss underwriting by an insurance company. Well, we may or may not need to reach that issue, but yes, if we do, it does raise some public policy concerns. Your Honor is correct, and I don't want to presume anything, but you may be going to the issue or the finding of the lower court, which did not reach or address the finding with respect to the general change endorsement that Stratford put on its policy almost a year post-loss. Why don't you deal with the District Court's first ruling? The District Court found that it did not have to reach the change endorsement issue because it looked at the agreement between Ryder and Dam, who was the Stratford insured here, and it said that in that agreement that it called for Ryder to procure insurance for the tractor, which was attached to the trailer here. And there's no dispute that in that agreement, part of the clause said that Ryder's coverage would be primary. However, at no point and nowhere in that agreement did it say that it would be non-contributory or sole primary. And it's a key principle of the insurance industry as well as established and endorsed in cases across the nation and in every state. That co-primary insurance can exist, and just because a contract calls for one party to procure a primary insurance policy does not mean that other policies can be procured that are also primary. And when that's the case, the comparison has to be made that if those policies are both in play and co-primary, how do they apply on an equal basis? And it is Old Republic's contention here that the policy issued by Stratford was indeed primary. That's the argument I'd like to hear. Can I ask you before you get to that, is Old Republic a third party beneficiary of either that insurance contract between Stratford and Dam or the contract between Dam and Ryder requiring Ryder to get insurance? And if you're not a third party beneficiary, what's your standing, your Article III standing? I think it has to be, Your Honor. If not for the fact that it is, who else but a co-primary insurer can raise this issue of coverage? It goes to the issue that, you know, one insurer who stands in a situation where another insurer also covers the loss must be able to recover a third party insurance policy. So the connection then for Article III purposes is to the loss, not necessarily to the insured. Right, but in this case, especially because of the grievous post-loss underwriting issues, you know, this court should definitely look and consider who else would have the standing to raise the issue. No, I think the cases generally support that. I just wanted to hear the argument. Going back to your... Could I just, if I heard you right, it depends on you being a third party beneficiary to have Article III standing? Is that the position? No. Okay. In fact, it's presumed because we are a co-primary insurer here. Because they both have equal say in the law, so one insurer does have standing against the other for its contribution. So even if you're not a third party beneficiary? Either way. But the cases that I was able to find all, the relationships don't go any more distant than two insurers covering one insured. And here the insured who is in the middle is a third party beneficiary of your contract with Rider. So I was just worried about the one step removed, but your point is that it doesn't depend on third party status anyway. It's not so much removed, Your Honor, because you take the tractor and the rig together and look at the coverages that come together for it. The one portion of the lower court order that I think gives forth a good analysis of how to approach this is where it cites to that main case, the ledger case. Where it essentially says that you have to take the tractor and the rig and its component coverages together as one. And so you look at what Rider had with DAM with respect to its coverages. You look at what DAM had with Coca-Cola with respect to its coverages. The Coca-Cola stream running up to Stratford and then coming down primary there. And the Rider stream coming down with Old Republic and being co-primary there. I think you should feel free to get to your argument. Okay, thank you. With respect to the issue that Judge Lynch raised, Stratford itself concedes that it didn't do the things that it could have to make it more clear that it was excess. David Hayward in his own affidavit, if you look at the record at 671 of the appendix in paragraph 9 of his affidavit, he states that it would have been typical for an excess endorsement ISO 2308 to be on the policy if that was indeed excess. Yeah, but I thought their initial position was not that they were excess, although they later endorsed it may become excess, maybe. But that if you actually look to the intentions of the parties, the fact that you were the primary insurer on the tractor trailer meant that there was no need for them to provide insurance for the tractor trailers. And that the term hired autos cannot, against that understanding, have encompassed the tractor trailers. And then if you add in the amounts actually paid for the coverage, that reinforces the view of what the party's intentions were. Two points to that, Your Honor. One is that they wrote it as about as broad as it could be, any auto Dan leases, hires or rents or borrows. Then you get into that including under symbol 46, any non-owned trailer while attached to a covered auto. Yeah, so you say the plain language makes it clear that the coverage extended to this tractor trailer. Now, I don't know New Hampshire insurance law, but what is the relationship between the plain language argument and the intention of the party's argument? As we briefed, we believe the court needed to go no further than the plain language. But is the court precluded from going any further? Our position is yes, and the cases support that. But the cases say you have to read the whole contract. You do have to read the entire contract. And by that, I mean the policy, the coverage granted by Stratford. Wouldn't the $5,000 a year versus $20,000 a month make a difference if you were reading the whole contract in terms of whether there was a meeting of the minds about what that provision meant? Well, to go to the meetings of the mind issue, Judge Lynch actually made the point that Stratford may have felt it owed no coverage here. But at a minimum, DAM felt that it was at least excess coverage. So there could not be mutual mistake here, because there wasn't the same misapprehension even at the beginning. And to the point of whether it was $5,000 or What's the evidence that DAM was under the impression that they were excess carriers, that Stratford was excess? Well, that's eventually where they came to in conceding. At the time, I thought there was no evidence that DAM thought there was coverage of these tractor trailers. DAM takes the position that it was excess, and they tendered to Stratford. So they had to assume there was some coverage there. Can you explain how that $5,000 representation works? My understanding of the policy is policy makes clear that's just an estimate, that the company is then free to go back if it finds out that the estimate was wrong and change to bump up to the full amount of coverage that the policy actually calls for. In other words, Absolutely, and that's somewhat what happened here. During the policy year, before Stratford even knew of the loss, it ran a report on a federal database, SAFER, which showed that DAM had commercial vehicles, that it was running tractor vehicles, and it found about 10 vehicles. It asked for an audit. That's when it led to starting to investigate the issue of whether the $5,000 representation was correct. That happened about a month after the loss here. Stratford still wasn't aware of the loss. It then waited until its policy expired. It then waited until the loss was served here, or notice was given, to then come back and say, and Bob Waterman at the MGA here, who was Stratford's agent, they had that binding power of pen and underwriting, says in an email, we have this claim, and I'm paraphrasing, but the email refers to the fact that they would like the general change endorsement because we now have this claim. That is the definition of post-loss underwriting. Stratford could have made that determination to be held to the standard that it's the insurance company. They accepted a premium based upon a representation. Insurance companies end up paying losses that they don't get the exact premium for all the time. That's why they have claim reserves. That's why they monitor claims. That's why there are solvency requirements at the regulatory level on insurance companies. Here, Stratford just sat on its hands for months at a time. Let the policy expire. Let the claim come in. Then said, oh, Houston, we have a problem here. I have an idea. Because you can tell from the setup of this that you had DAM dealing with FOI, who is their broker. FOI then going through South Coast, who is the MGA. The MGA then going up to Stratford. And finally, this percolated up where somebody at Stratford decided to do some due diligence on this. But that doesn't change the fact that because Stratford gave the pen to somebody else and didn't do its due diligence that it should be able to come in here and rewrite history after the fact for a clear, plain, and ambiguous policy. That last point, I'm trying to figure out under New Hampshire law, there was reference to mutual mistake and what that really means in this context. So I take it no one is arguing that there was essentially just a void policy because there was no meeting of the minds. The issue is what was the scope of the policy that everybody concedes was agreed to. So what does New Hampshire law tell us about our ability to look at intention of the parties in terms of construing the scope of a contract when the terms of the contract seem to be plain? If there's an ambiguity, the court can look at extrinsic evidence. If the language is plain and straightforward, then the contract has to be applied. Here we take the position, and even Stratford has conceded in affidavits and at deposition that but for the change endorsement, this policy granted primary coverage to the trailer. No, I don't believe they've done any such thing, and you keep repeating that in your briefs, and I think it's inaccurate. May I ask you on the second part of the case, normally as to defense costs, the majority rule in this country is that an excess carrier is not on the hook to pay any defense costs until the primary insurers limits of coverage. I think it's a million dollars here have been met. The district court thought that a particular case of the New Hampshire Supreme Court dictated a contrary result here. But as a practical matter, what are the defense costs in this case? Is this a live issue? Is this not a live issue? Do the defense costs exceed a million dollars? I can, and to be candid, Your Honor, I don't have that information right now. I can tell you that its costs have been significant. Yes, of course they would be. Six-figure costs. I understand we have the issue. It is a live issue. In any event, because they've been ordered to pay on an equal basis the defense costs as they are being paid right now. That's correct. And the lower court, even in the reconsideration motion that was made, said it may not be the rule that is the general rule, but it's the rule of the Supreme Court of New Hampshire. And the case is cited even by counsel of other federal courts, district courts, interpreting that, including the Towner-Stoddard case. Yes, but it's a little unclear to me whether the New Hampshire court meant this result and what they would say if this issue were put to them directly. So do I take it you would have no objection to certification of this question to the New Hampshire court? On that issue, that's court prerogative, and we would have no objection. Thank you. Thank you. Your Honors, Lawrence J. Rabinovich, Hiscock & Barclay, New York City, for appellee and cross-appellant Stratford, and I apologize for the shape of my voice. It's gotten worse as I'm sitting here. Shall I begin very briefly with the second question and get that out of the way? Obviously, Stratford would be pleased to have the issue sent to the New Hampshire Supreme Court. We cited one of the few cases that the Supreme Court of New Hampshire itself used to describe the universal case, and it sounds very different than the way this case came out. So we don't think there's any basis for thinking that New Hampshire has a special rule, and we would be delighted if you gave the Supreme Court of New Hampshire a chance to clarify its position on that. Alternatively, it seems to me that you are certainly capable, you have the capacity at this point, to say that the existing case law in New Hampshire does not mandate a different result than what's standard in the industry. Okay. Now, the court raised many important issues with respect to the initial dispute here, which is the relative status of the two insurance policies, and since both Judge Barron and the Chief Judge asked about New Hampshire law specifically with respect to looking outside the contract, I thought that I would respond to that. Having said that, it should be stressed that Judge McCafferty was very careful in not going outside the policy. Judge McCafferty said, well, I have the clauses, I have the definition that counsel referred to of hired autos. I also have in the policy itself, not only in the underwriting file or the application, in the policy itself we have a reference to the $5,000 cost of hire. But the policy specifically says that that's not binding. Absolutely correct. So I don't understand why that would be significant in determining what the scope of the policy is. That's just a representation of what they'll pay unless they're found out to not be really telling the truth. That's fair. Now, again, let me try to react to that by citing to the New Hampshire case law that I began focusing on. It may also be significant to point out that the insured, DAM Express, that's the way they prefer referring to their name, they have never suggested, no one has suggested that they spend more than $5,000 a year renting vans. In fact, they thought that the $5,000 might be an overstatement. They occasionally go get additional vans during holiday season when they need some extra trucks. So there's been no suggestion whatsoever that DAM misrepresented its cost of hire. The question, rather, was whether when DAM represented its cost of hire, it was referring to the vans, which is what they say they were referring to, or whether they were referring to something else. Now, I should probably start with an important line from the restatement that I think I left out of the brief. This is Restatement Second of Contracts, Section 212, Comment B, which permits a court to look to extrinsic evidence with respect to the situations of the parties or highlight the subject matter of the transaction. So certainly in terms of general law, subject matter of the transaction is what this is about. Was the policy focused on providing coverage for two vans plus an occasional extra van that they picked up? Do you agree with your fellow counsel that that's true when there's an ambiguity in the terms of the policy, or is that true even when there's no ambiguity? Not necessary to be an ambiguity under New Hampshire law, for sure. Let me cite some of the case law, which I think goes to this point, which both of you have expressed an interest in understandably. In the lawyer's title insurance company versus Groff, a 2002 decision, the court noted the long-established New Hampshire position that one may interpret the language of the contract in light of the circumstances and context in which the agreement was negotiated. And then in the tech-built case, a 2006 decision of the Supreme Court, here I will quote, where the intent of the contracting parties can be conclusively resolved by objective extrinsic evidence, as in this case, we will not ignore that evidence in favor of dogmatic adherence to insurance maxims. And the court went on to say how important it is, specifically under New Hampshire law, to get to the intent. Was the maximum there that you should respect the plain intent, plain language? The maximum there is that normally one stays within the four bounds. We understand that. That's basic rule. But the court was saying that specifically under New Hampshire law, there is an important accompanying principle that says that ultimately the bottom line is to get to the intent of the parties. Well, can we just plain that out? How would we deal with that here? So the plain language of the policy covers trailers? Can I correct an error? Let's just make this clear. Counsel has initially cited the wrong section of our policy with respect to the trailer issue. The trailers are not covered. I'm happy to go chapter and verse here. The trailers are not covered by the Stratford policy at all. The trailers are not an issue here. The only way we would cover a trailer is if it were attached to a covered auto described on the policy, described in item three, which is the place where the two vans are listed. So if a trailer were attached to one of those two vans, then that trailer would become an insured under the policy. Here, the giant rig that they leased from Ryder obviously is not scheduled on our policy. It is not described in item three. And therefore, any trailer that's attached to the tractor is not covered by our policy. So just to be absolutely clear, the trailer is not covered by the policy at all. From our point of view, the question is whether the tractor is covered. Okay? Even though, again, here the issue of the intent and so on remains crucial. And is there any reference in the policy to the word tractor? Absolutely. Yeah, so the forms, by the way, these forms, pardon me. That's okay. Let me tell you exactly how it says that. These forms are drafted by an organization called ISO, Insurance Services Office. And I would ask the court to look at joint appendix page 84, which is the definition of terms in the policy, and specifically what counsel referred to. The policy refers to trailers, and it refers to power units. And what it says there is that trailers, trailers, any trailers you don't own are covered while attached to any power unit described in item three, end quote. And a tractor is a power unit? A tractor is a power unit, and I should have made that clear. What does that say in the policy? It does not say that. That's common knowledge among people who read these sort of things for a living. The power unit, obviously that's where the engine is, that's the tractor. The trailer has no marriage. What do you say, power units described in section? Or just any power unit? Power unit described, attached to any power unit described in item three. Okay. Item three is the section of the declarations page in which the insured's vehicles are listed. And this item three in this policy, it's here in the Joint Appendix at page 82, lists the two vans. There were no tractors in this policy. It lists the two vans, which are the power units that were covered by this policy. Therefore, your argument is no tractor trailer was covered by those terms of the policy. Absolutely not. It would only be if you read hired autos. Absolutely. Under symbol 46, there's no coverage for anything here, neither the tractor nor the trailer. In light of that, is there an argument that hired autos is ambiguous? I think that's exactly, I think that's where the judge went. It's not how he wrote it. It doesn't seem to be how he wrote it. Gee. I think that's where she was headed. The answer is, I think that's a fair point. Most of the time, the term hired auto is understandable and there is a definition in the policy. The difficulty here, which is highlighted by the premium disparity, is that because of the way D.A.M. did business, hired auto did, in fact, have two meanings. That is, it had, there were potential hired autos, as in the occasional seasonal van, and then there was the ongoing hiring of the tractor units from Rider, which our client was not told about. So the answer is yes, I think there is an ambiguity here. It's not an ambiguity that someone coming to you and having an issue might locate. Could you help me with just working through the power unit and the trailer point? If hired auto itself covered tractors? Symbol 47, which is the symbol for hired autos, would cover power units, assuming that they fall within the definition of hired autos as interpreted by the policy and the context. I guess what I'm getting at is just the fact that there's this specific reference to power units described in Section 3, and that doesn't list just vans. Does that have any bearing on what hired auto must have meant? I think it does have a bearing to what hired auto must have meant to these players entering into these contracts. And, of course, nobody wrote anything. These forms are pre-printed. They're used throughout the industry. The question is what did Stratford do and what did DAN do as they were negotiating this policy through their respective agents? What were they doing? And I did want to point out something that came up in one of the depositions that I think is very important. This came up during the deposition of the fellow who actually did the underwriting to the policy. And he pointed out that the sort of work that DAN represented to Stratford that it did, which is small vans taking products, office supplies, and small home furnishings is how it was described, as opposed to the large tractor-trailers which take big loads. Well, how many of these rider tractors did they rent? What does the record show about that? Yes. So as Council correctly pointed out, the reference in the U.S. DOT database suggested that there were 10 vehicles altogether. I've never been able to locate anything near there. We know that for sure. Again, DAN, this is a self-reporting by the insurer that they put into the system. It may be that they over-listed it. To the best I can tell, they were renting two or three tractor-trailers at a time. Two vans for the entire year? Two vans. The vans were used for their package deliveries, the small deliveries. Those were owned by DAM, and those were insured by Stratford. The tractor-trailers were not owned by DAM. Those were owned by Rider. We believe that there were two or three. Again, it seems to have changed month by month. Maybe some months there were more. But it looks like the tractors, the large units, the large power units, were hired by DAM from Rider and insured through Rider. And that was done, it seems, even though Stratford learned about this only towards the end of the final policy period in which it was modeled. It seems that this had been done for many years. But DAM had not revealed that to Stratford, presumably because DAM said, well, I'm covering those through Rider. As part of my fee, I'm paying for insurance. Therefore, I don't need to tell my other insurance company about this because they would charge me a fee for that. I'm a little puzzled. I thought from your construction of a power unit that your argument would be, actually there wasn't an ambiguity. The contract is pretty clear. It works in our direction. And then if you look at all of the extenuating circumstances, which you can do regardless of whether there's ambiguity, our construction has to prevail. I think you're a better attorney than I am, Your Honor. That's fair. If I may, just one other point. Just on that point, that would explain, I guess, why the trailer wouldn't be covered. But there's still a question of whether the tractor is covered as a hired auto. I think what the Chief Judge was suggesting was that we can derive from the definition of 46. If 46 is referring to power units, meaning the two power units that are described in the declarations page, then the same term But I understand that. I guess the significance of that part of power unit, if I understood what you were saying, is only to explain the extent of the coverage of a trailer. Well, the definition of hired autos is... Don't switch over to that yet. Just on this point, right? Absolutely. The word power unit that I refer to exists in the definition of 46, which is specifically described autos. But isn't that for the purpose of deciding whether a trailer is covered? No. Or is that not right? Let me see if my understanding is correct. We'll work our way through this. Power unit as described elsewhere in the policy. Elsewhere in the policy, the reference is to the two vans. The power unit means those two vans. Correct. But the significance of that logic train is to determine whether a trailer is covered. The initial point of departure is there, for sure. Correct. So separate and apart from that, if I have a tractor, let's say they rented a tractor not from Ryder. They got their two vans. They also had a tractor, and the tractor had a trailer. You would say they could not get coverage for the trailer because they hadn't listed the tractor as one of the power units. But could they get coverage for the tractor as a hired auto? That's a yes, no kind of question. The answer is no. Okay, and why? I think it has to be no because of the nature. The subject matter of the agreement was for vans, not tractors. I know I'm gone, but can I make one final point, which might help explain some of the thinking that went behind Stratford's. These were not evil machinations. These are good people who found themselves in an unfortunate, unexpected situation and tried to figure out what to do. The factor that lies behind much of the conclusion here was that in addition to the policy language, Stratford, as required by federal law for a federal motor carrier, had issued as part of the policy an endorsement and made a filing with the U.S. DOT in Washington, which said that in the event judgment is entered against the trucking company, we will pay that judgment. Quite apart from any terms of the policy itself, this is a very broad endorsement. And what Stratford realized very early on was that even if they went through the great difficulty of trying to avoid a policy ab initio retroactively and after a loss, therefore endangering its relationship with the insured and many other things, even if they had eventually succeeded in doing that, which is very difficult, at the end of the day they would still have been responsible for any judgment entered against the insured, albeit on an excess level, because of the federal filing. Therefore, they were sort of in a very difficult place, where the option of rescinding policy was not really there. The question was, were they going to be an excess policy based on the policy language, which is what they did through the amendation, or were they going to effectively be an excess policy because of the MCS 90 endorsement, which would have made them an excess policy even had the policy been voided. Thank you, Your Honors.